O

UNITED  STATES  DISTRICT  COURT

FOR  THE  CENTRAL  DISTRICT  OF  CALIFORNIA

| | | |
|---|---|---|
| JAMAL ASIM SHAKIR,<br><br>   Petitioner,<br><br>   v.<br><br>EDWARD S. ALAMEIDA, Warden, et al.<br><br>   Respondents<br><br>_____ | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CASE NO.  CV03-8732 DOC (MANx)<br><br>**O R D E R** GRANTING PETITION<br>**FOR HABEAS CORPUS**; SETTING<br>HEARING DATE |

Before the Court is Petitioner Jamal Asim Shakir's ("Shakir") Notice of Appeal, construed as a Notice of Motion for Certificate of Appealability.  After considering the Petition, the Return, the Traverse, the Court's prior Order denying the petition, the Notice of Appeal, the Governments response, and all other filings in this matter, and for the reasons set forth below, the Court hereby RECONSIDERS its Prior Order, GRANTS the petition.

## I.    BACKGROUND

In 1992, Shakir's aunt gave him a laptop computer as a graduation gift.  In 1996, Shakir lent the laptop to Lameisha Anderson ("Anderson"), his girlfriend and the mother of his child.

In July 1996, Shakir asked Anderson to return the laptop so that he could use it. Anderson told Shakir that she left the laptop with her friend Shannon Walker. Shannon Walker was involved in a drug-related enterprise with Shakir and Anderson.

Shannon Walker shared her home with her uncle, the purported victim Phillip Martin ("Martin"), as well as Martin's mother, his brother, and his brothers two children. Martin was known to use crack cocaine. Indeed, evidence suggested that Martin stole the laptop and exchanged it for crack cocaine.

At about noon on July 29, 1996, Anderson came to Shannon Walker's home to retrieve the laptop. Shannon Walker was in Palm Springs at the time, and Anderson attempted unsuccessfully to contact Shannon Walker. Martin told Anderson that he recalled Anderson using the laptop while visiting Shannon Walker at the home, but did not recall her leaving the laptop at the home after using it. Anderson looked through Shannon Walker's room but could not locate the laptop. She became visibly upset and again asked Martin the whereabouts of the laptop. Martin then stated that Shannon Walker's father, Michael Walker, known as "Big Mike," had been in Walker's room earlier in the day and may have stolen the laptop. Anderson left.

Anderson returned that evening. Shakir and his brother Hiram Shakir arranged to meet Anderson at the house at this time. Anderson entered the house and told Martin to go outside and tell Shakir, who was Anderson's boyfriend, that Michael Walker may have stolen the laptop. Michael Walker testified that he observed Martin that evening and that Martin was under the influence of crack cocaine. Martin knew Shakir as Anderson's boyfriend, although he had never met Shakir and knew him only as "Jamal" or "Donut."

Martin exited the house and saw Jamal and Hiram Shakir standing in neighbor Betty Lowe's driveway. Shakir asked Martin where the laptop was. Martin said he did not know. Jamal and Hiram Shakir attempted to force Martin into their car. Shakir said that they would kill Martin if Martin did not take them to the laptop. Martin said "No, I didn't do it. No it wasn't me." Jamal and Hiram Shakir kicked Martin while Martin was on the ground in the fetal position, and then forced him into the back seat of the car. Shakir got in next to him.

Shakir hit Martin while they were in the car and struggled to prevent Martin from

1  escaping.  Martin claimed that Petitioner again threatened to kill him while they were in the car.

2  Martin claims that he saw the handle of a handgun in the car, but that Shakir never brandished it.

3  Martin provided inconsistent statements about the location of the handgun inside the car.

4  Shakir demanded that Martin take them to the laptop.  Martin stated he did not know where the

5  laptop was.  Shakir demanded that Martin take them to Michael Walker, but Martin did not

6  know where Michael Walker lived.

7       The evidence was hotly disputed as to how Martin left the vehicle.  Martin claims he

8  jumped out of the car after hearing Shakir say he was "fixing to kill" Martin.  Martin further

9  claims that Shakir jumped out and struggled with him in the street, and that Harim Shakir parked

10  the car and also tried to force him back in the car.  Martin purportedly shouted to a security

11  guard at the nearby "Player's Club," but the guard ignored him.  He claims that he was able to

12  escape from both Jamal and Harim Shakir and run down the street.  He further states that

13  Anderson tried to block him with her car but that he avoided her and ran away.  He the claims

14  that he phoned his mother from a phone booth and that she drove him home.  His mother

15  contradicted this testimony, saying that she dropped him off elsewhere.

16       According to Shakir, when he arrived at Martin's residence he asked Martin what

17  happened to his laptop and Martin said that Michael Walker stole it.  Shakir further stated that

18  Martin said he knew the general area where Michael Walker lived but refused to take Shakir to

19  see Michael Walker.  He claims that this caused he and Martin to engage in a fight, which Harim

20  Shakir broke up.  He states that Harim Shakir eventually convinced Martin to voluntarily enter

21  the vehicle.

22       Once inside the vehicle, Shakir claims that Martin led them to a residence where he

23  believed Michael Walker was staying.  The woman who answered the door at this residence

24  stated that she did not know Michael Walker.  This made Shakir angry and he refused to allow

25  Martin back into the car.  Shakir allegedly threw Martin to the ground when Martin tried to

26  reenter the car.  Shakir claims that he and his brother then left.

27  Martin claims that he suffered cuts and abrasions on his face, back and shoulders.  He did not

28  seek medical attention or report the kidnapping to police.  Michael Walker came to Martin's

home that evening at Shannon Walker's request, but stated that Martin had no visible injuries and was under the influence of crack cocaine.

Martin eventually reported the kidnapping during an investigation of Shannon Walker's murder in October 1996.  Because the kidnapping was not the focus of the investigation, Martin did not provide details.  He told Detective Michelle Esquivel that "Donut" told him "you better tell me something."  He stated that he did not report it previously because he was afraid of repercussions due to Shannon Walker's business dealings with Shakir and Anderson.

On October 2, 1997, the police interviewed Martin about the kidnapping and he signed a police report.  At this time police implicated Shakir in Shannon Walker's murder,[1] as well as other crimes, although he has never been charged with them.  The police told Martin that this report would help establish a pattern of conduct by Shakir, which would be helpful in proving the murder.  Martin said that he was comfortable doing so because Shakir and Anderson were in custody at the time.

On December 2, 1997, the State filed an information in the Los Angeles Superior Court charging petitioner with two counts of Kidnapping for Ransom or Extortion in violation of California Penal Code § 209(a) based on separate events.  On August 11, 1998, a jury convicted petitioner of one count based on the event described above.  The jury deadlocked as to the second count, and the judge declared a mistrial on that count.  The trial court sentenced Shakir to life with the possibility of parole, the only penalty authorized under Penal Code § 209(a).

Petitioner unsuccessfully appealed in the state courts, including the California Supreme Court.  He then filed a Petition in the state courts, which was also rejected.  On December 1, 2003, Shakir filed the now-pending Petition.  The Court adopted the well-reasoned Report and Recommendations of Magistrate Judge Nagle dismissing the Petition with prejudice.  On February 11, 2008, Shakir submitted a Notice of Appeal.  Judge Nagle treated this Notice as a request for a Certificate of Appealability and recommended the Court deny the request.  The

---

[1] Shakir was not prosecuted for Shannon Walker's murder.  Instead, it appears that another "Donut" from a different crip street-gang killed Shannon Walker.  "Donut" is a common name among gang members, especially those that are overweight.

1   Court took the matter under submission to reconsider the record on the Petition.

2   **II.   LEGAL STANDARD**

3   Under 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty

4   Act of 1996 ("AEDPA"), a federal court may grant habeas relief to a person in state custody

5   only if "the adjudication of the claim (1) resulted in a decision that was contrary to, or involved

6   an unreasonable application of, clearly established Federal law, as determined by the Supreme

7   Court of the United States; or (2) resulted in a decision that was based on an unreasonable

8   determination of the facts in light of the evidence presented in the state court proceeding."  28

9   U.S.C. § 2254(d); *see also Brown v. Payton*, 544 U.S. 133, 141, 125 S. Ct. 1432 (2005).

10  Petitioner's claims arise under Section 2254(d)(1) – i.e. that his conviction was contrary to

11  clearly established Federal law.

12  Clearly established Federal law "refers to the holdings, as opposed to the dicta, of

13  [Supreme Court] decisions as of the time of the relevant state-court decision."  *Williams v.*

14  *Taylor*, 549 U.S. 362, 412, 120 S. Ct. 1495, 1523 (2001); *see also Carey v. Musladin*, __ U.S.

15  __, 127 S. Ct. 649 (2006); *Lockyear v. Andrade*, 538 U.S. 63, 71-72, 123 S. Ct. 1166 (Clearly

16  established Federal law is the "governing principle or principles set forth by the Supreme Court

17  at the time the state court renders its decision.") Thus, Petitions arising under Section 2254(d)(1)

18  are governed only by the holdings of Supreme Court decisions.  *Hernandez v. Small*, 282 F.3d

19  1132, 1140 (9th Cir. 2002).  However, Ninth Circuit decisions are relevant "to the extent that

20  they illuminate the meaning and application of Supreme Court precedents."  *Campell v. Rice*,

21  408 F.3d 1166, 1170 (9th Cir. 2005) (en banc).

22  A state court's decision is contrary to clearly established Federal law if the state court

23  applies a rule that contradicts the Supreme Court's statement of the governing law or reaches a

24  different conclusion on materially indistinguishable facts.  An unreasonable application of

25  clearly established Federal law occurs where the state court identifies the correct rule but

26  unreasonably applies it to the facts of the case.  *Williams*, 529 U.S. at 412-13.  Mere

27  misapplication of Federal law is insufficient, the application must be objectively unreasonable.

28  *Andrade*, 538 U.S. at 75; *Williams*, 529 U.S. at 409; *Penry v. Johnson*, 532 U.S. 782, 793, 121 S.

1  Ct. 1910 (2001).

2  **III.    DISCUSSION**

3        The Court declines to reconsider its prior order dismissing the Petition, except that it does

4  reconsider Shakir's claim that the State presented insufficient evidence at trial to support his

5  conviction for aggravated kidnapping under California Penal Code § 209(a).  The Court now

6  addresses that claim.

7        In order to satisfy the Fourteenth Amendment Due Process Clause, before a criminal

8  defendant can be convicted the State must prove each element of a charged offense beyond a

9  reasonable doubt.  *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068 (1970).  The elements of the

10  crime are drawn from state substantive law.

11       On habeas review, a petitioner raising an insufficient evidence claim "faces a heavy

12  burden . . . ." *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005).  "[T]he relevant question is

13  whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational

14  trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

15  *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781 (1979) (emphasis in original). "Put

16  another way, the dispositive question under *Jackson* is 'whether the record evidence could

17  reasonably support a finding of guilt beyond a reasonable doubt.'" *Chein v. Shumsky*, 373 F.3d

18  978, 982-83 (9th Cir. 2004) (en banc) (quoting *Jackson*, *supra*).  "A jury's credibility

19  determinations are . . . entitled to near-total deference under *Jackson*."  *Bruce v. Terhune*, 376

20  F.3d 950, 957 (9th Cir. 2004).  Further, a conviction may be based only on circumstantial

21  evidence and inferences drawn therefrom.  *Walters v. Maass*, 45 F.3d 1355, 1358 (9th Cir.

22  1995).

23       Petitioner was convicted under California Penal Code § 209(a), which provides:

24            Any person who seizes, confines, inveigles, entices, decoys, abducts,

25            conceals, kidnaps or carries away another person by any means

26            whatsoever with intent to hold or detain, or who holds or detains,

27            that person for ransom, reward or *to commit extortion* or to exact

28            from another person any money or valuable thing . . . is guilty of a

6

1    felony . . ..

2    (emphasis added).

3         For purposes of this proceeding, the Court assumes that the jury correctly found that

4    Shakir kidnapped Martin.  This leaves only the issue of whether the kidnapping was aggravated

5    under Penal Code § 209(a).  The crime of aggravated kidnapping is complete when the

6    kidnapping occurs, if it is "done for [one of] the specific purpose[s]" listed in the statute.  *People*

7    *v. Anderson*, 97 Cal. App. 3d 419, 425 (1979).  The specific purposes include: a) ransom; b)

8    reward; c) extortion; or d) exacting money or property from a third person.[2]  *People v. Chacon*,

9    37 Cal. App. 4th 52, 62 (1995).  Kidnapping with the intent to engage in any such purpose is

10   sufficient to convict even if the intended offense is never completed.  *Id.*

11        There is no evidence in the record that Shakir kidnapped Martin for ransom or reward.

12   The State did not proffer this theory at trial.  Instead, the State relied on kidnapping to exact

13   money or property from another, Michael Walker, and kidnapping for extortion.

14        The State contends that it is immaterial whether Shakir intended to obtain the laptop from

15   Martin or from Michael Walker.  Instead, it argues that the general intent to take the laptop from

16   whoever had it was sufficient to convict Shakir under either the "extortion" or "exacting" prongs

17   of Section 209(a).  If Shakir believed that Michael Walker had the laptop, claims the State, then

18   he intended to "exact" the laptop from Michael Walker.  Likewise, if Shakir believed that Martin

19   had the laptop, claims the state, then he intended to "extort"the laptop from Martin.

20        This theory is untenable.  The generalized intent to take the laptop from Martin or

21   Michael Walker is insufficient to satisfy the specific intent element of Section 209(a).  *See*

22   CALJIC 9.53 (aggravated kidnapping is a specific intent crime).  Simply put, no reasonably jury

23   could find, beyond a reasonable doubt, that Shakir intended to "extort" the laptop from Martin or

24   "exact" it from Michael Walker based on evidence that Shakir intended to acquire the laptop

25   from whoever had it.  Because the State did not elicit evidence from which a reasonable person

26   ⸻⸻⸻⸻⸻

27      [2] Petitioner claims that "exact from another person any money or valuable thing"
     modifies "extortion."  This is not the case.  It is a distinct form of aggravated kidnapping.

28   *People v. Ibrahim*, 19 Cal. App. 4th 1692, 1696 (1993).

could discern Shakir's intent with any more specificity, the conviction cannot stand.

Further, for the reasons identified below, the evidence presented at trial was insufficient to support a conviction under either theory. The Court will address each potential theory in turn.

### A.     Intent to Exact Money or Property From Another

Kidnapping to exact money or property from another is the only form of aggravated kidnapping that requires a primary victim (the kidnapped party) and a secondary victim (the exacted party). *Ibrahim*, 19 Cal. App. 4th at 1696. The offense requires a direct causal connection between the kidnapping itself, and the intended result – i.e. the exaction. In other words, the defendant must intend the kidnapping itself to cause the third party to give up the money or property. Because the Government has failed to prove such a causal connection, it cannot prevail on this theory.

### 1.     Penal Code Section 209(a) Requires a Direct Causal Connection between the Kidnapping and the Intent to Exact Money or Property

Many factors signal that the legislature intended there to be a direct connection between the kidnapping itself – i.e. the deprivation of liberty – and the intended purpose of "exacting" money or property from a third-party. *People v. Greenberger*, 58 Cal. App. 4th 298, 367 (1997) ("aggravated kidnapping requires the deprivation of a person's liberty for the purpose of obtaining a financial gain.") In other words, the defendant must intend to use the kidnapping itself in some way to exact the property – e.g. where the defendant kidnaps the victim and refuses to release him or her until the third person turns over money or property. It is insufficient to kidnap the victim with the intent to later exact something from another – e.g. where the defendant kidnaps the victim and forces the victim to identify a third-party with a great deal of money so that the defendant may later exact the money from the third-party through means other than the kidnapping. Accordingly, the Court must interpret the statute in a way that comports with this intent, and require such a connection.

First, the plain language of the statute strongly suggests a construction that requires the deprivation of liberty itself to be the intended cause of the exacting. Accordingly, the Court must construe the statute in this fashion. "Penal statutes will not be made to reach beyond their

1   plain intent; they include only those offenses coming clearly within the import of their

2   language." *Keeler v. Superior Court*, 2 Cal. 3d. 619, 632 (1970) (citing *De Mille v. American*

3   *Fed. of Radio Artists*, 31 Cal. 2d 139, 156 (1947)).

4       The first four clauses of the statute fairly track the offense of simple kidnapping. *See* Cal.

5   Penal Code § 207(a) ("Every person who forcibly, or by any other means of instilling fear, steals

6   or takes, or holds, detains, or arrests any person in this state, and carries the person into another

7   country, state, or county, or into another part of the same county, is guilty of kidnapping.") The

8   first clause of Section 209 (a) lists the *actus reas* of the crime: seizing, confining, etc.  The

9   second clause, set off by a comma, broadens the first clause by stating that the above-listed

10  conduct can occur "by any means whatsoever."  The third clause lists a *mens rea* element:

11  "intent to hold or detain."  The fourth clause lists an alternative: rather than engage in the above-

12  listed conduct "with the intent to hold or detain," the defendant may simply hold or detain the

13  victim.

14      The statute then lists the specific aggravating intents that distinguish simple and

15  aggravated kidnapping: "for ransom, reward," "to commit extortion," or "to exact from another

16  person any money or property."  These clauses appear to modify the *actus reas* elements listed

17  above.  Thus, a person could, for instance, seize another for ransom, inveigle another for reward,

18  or abduct another to commit extortion.  Relevant here, a person could kidnap someone *to exact*

19  money or property from a third party.

20      The construction of the statute suggests that the aggravating intent must attach to the

21  kidnapping itself.  For the phrase "to exact" to modify the act of kidnapping, the defendant must

22  intend to use the kidnapping to exact money or property from a third-party.  The specific

23  purpose of the kidnapping itself must be to coerce a third person to turn over the money or

24  property.  It appears insufficient for an individual to kidnap another as a step in the causal chain

25  towards exacting something.  It cannot properly be said that the defendant kidnapped the victim

26  "to exact" money or property if the kidnapping itself is not the intended cause of the exaction.

27      Second, the use of the term "exact" suggests more than merely "obtaining" something of

28  value.  *Cf. Greenberger*, 58 Cal. App. 4th at 366 n.52 (district court modifies model jury

1  instruction to replace "obtain" with "exact," final instruction states intent element as "[t]his act

2  was done with the specific intent to hold or detain such person . . . to exact from another person

3  any money or valuable thing."). In deciphering the intent of the legislature, the Court must first

4  look at the common meaning of the terms used in a statute. *California Teachers Ass'n v. San*

5  *Diego Comm. College Dist.*, 28 Cal. 3d 692, 698 (1981) (citations omitted). "To ascertain the

6  common meaning of a word, 'a court typically looks to dictionaries.'" *People v. Whitlock*, 113

7  Cal. App. 4th 456 (2003) (quoting *Consumer Advocacy Group Inc. v. Exxon Mobil Corp.,* 104

8  Cal. App.4th 438, 444 (2002)). The American Heritage Dictionary defines the verb "to exact" as

9  "to force the payment or yielding of; extort" or "to demand and obtain by or as if by force or

10  authority." By using the term "exact," it is evident that the legislature intended to require more

11  than simply obtaining money or property.

12        To kidnap for the purpose of exacting, it appears that the kidnapping itself must be

13  undertaken to force payment or yielding of a thing of value from a third person. In other words,

14  for the kidnapping to occur in order to exact a thing of value, it must be the case that the

15  defendant intended the kidnapping to be the direct cause of payment or yielding. This is the

16  stereotypical case of kidnapping to exact money or property – i.e. the defendant kidnaps another

17  and conditions his or her release on the turning over of a valuable thing. This interpretation is

18  also supported by the history of the aggravated kidnapping statute.

19        Third, before 1982, the "exacting" prong of Section 209(a) required the defendant to

20  exact the money or property "from relatives or friends of such person." This suggests that the

21  government had in mind the stereotypical kidnapping to exact money or property when it

22  enacted the legislation in question. In such a case, a kidnapper detains an individual and

23  demands that his or her relatives or friends give the kidnapper valuable consideration to assure

24  the victim's return.

25        Fourth, the requirement of a direct connection between the kidnapping and the exacting is

26  compelled by the canon of statutory interpretation *noscitur a sociis* – i.e. "it is known from its

27  associates." Pursuant to this canon "a word may be defined by its accompanying words and

28  phrases, since 'ordinarily the coupling of words denotes an intention that they should be

1  understood in the same general sense.'" *California Farm Bureau Federation v. California*

2  *Wildlife Conservation Bd.*, 143 Cal. App. 4th 173, 189 (2006).  Each of the other terms listed in

3  Section 209(a) suggests that the kidnapping itself, without more, is the intended cause of the

4  payment – i.e. the kidnapping is the force used to extract the consideration.  The American

5  Heritage Dictionary defines "ransom" as "the release of property or a person in return for

6  payment of a demanded price."  Here, the consideration is paid as a direct result of the

7  kidnapping, in order to end the kidnapping.  The American Heritage Dictionary defines "reward"

8  as "money offered or given for some special service, such as the return of a lost article or the

9  capture of a criminal."  Again, the consideration is given as a direct result of the kidnapping

10  upon the return of the victim.  Finally, extortion is defined in Section 518 as "the obtaining of

11  property from another . . . induced by a wrongful use of force or fear . . .."  Again, the

12  kidnapping itself can satisfy the "force or fear" element.  The traditional kidnapping for

13  extortion is to kidnap an individual and demand payment for his or her release.  In light of the

14  proximity to these other terms, in which the kidnapping itself is used to compel payment, the

15  term "exact" must be interpreted in the same fashion.  That is, the Court must interpret "exact" to

16  encompass a situation where the kidnapping itself is the cause of the exaction.

17       Fifth, the Government's interpretation of the statute could lead to absurd results.  *See*

18  *Ludwig v. Superior Court*, 37 Cal. App. 4th 8, 18 (1995) ("It is well-established that a statute

19  open to more than one construction should be construed so as to avoid anomalous or absurd

20  results." (citing *In re Eric J.* 25 Cal. 3d 522, 537 (1979))).  Without a causal connection

21  requirement, a defendant could be convicted where the kidnapping and the exacting of money or

22  property are only tangentially related.  For instance, an individual could be convicted of

23  aggravated kidnapping for kidnapping a low-level drug dealer to prevent him or her from

24  interfering with a robbery of a drug stash.  Under the Government's interpretation, the

25  kidnapping was "to exact money or property" because it was a necessary step towards exacting

26  money or drugs from the owner of the drug stash.  This is so far different from the traditional

27  understanding of kidnapping to exact money or property that it cannot be what the legislature

28  intended.  *Keeler*, *supra*.  It also fails to comport with the common meaning of the phrase "to

1  exact" and runs afoul of the distinction between kidnapping to exact property and kidnapping for

2  robbery.

3         Finally, the rule of lenity requires the Court to interpret the statute narrowly where it is

4  reasonably subject to such a construction.  The Court must give "the benefit of every reasonable

5  doubt as to the meaning of the language used in a penal statute" to the defendant.  *People v.*

6  *Platz*, 136 Cal. App. 4th 1091, 1102 (2006) (citing *People v. Fenton,* 20 Cal. App.4th 965, 968

7  (1993)).  Under the rule of lenity the Court must favor a construction that avoids harsh results

8  where a statute is equally open to two interpretations.  *Id.* (citing *People v. Hernandez,* 30 Cal.

9  4th 835, 869-870 (2003)).  Section 209(a) is reasonably subject to the requirement of a direct

10  causal connection between the kidnapping and the exacting of property for the reasons identified

11  above.  Thus, the Court is compelled to adopt such an interpretation.  Simply put, an individual

12  should not spend the rest of his life in prison because he engaged in conduct that may or may not

13  have violated an ambiguous statute.

14         **2.      There Is No Evidence in the Record that Shakir Intended to Exact the**

15                 **Laptop from Michael Walker by Kidnapping Martin**

16         There is no evidence in the record from which a reasonable jury could find, beyond a

17  reasonable doubt, that Shakir had the necessary direct intent to exact the laptop through the act

18  of kidnapping.  The evidence presented, viewed in the light most favorable to the prosecution,

19  does not suggest that Shakir intended to use Martin's kidnapping to exact the laptop from

20  Michael Walker.

21         The evidence showed that, in all likelihood, Shakir did not believe that Michael Walker

22  had the laptop.  Instead, when Shakir confronted Martin about the laptop, Martin denied

23  knowledge of its whereabouts.  Martin's neighbor heard Martin tell Shakir and Hiram Shakir

24  that he did not steal the laptop, suggesting that Shakir accused Martin of taking the laptop.

25  Shakir and his brother then beat Martin, who was on the ground in a fetal position and forced

26  him into a car where they told him to take them to the laptop.  The two then drove Martin

27  around, allegedly holding him at gunpoint, demanding that he take them to the laptop.  All of

28  this occurred despite the fact that Shannon Walker was able to cause Michael Walker to return to

1   the home in a relatively short period of time.  Their lack of confidence in Martin's claim was

2   well-founded as Martin exchanged the laptop for crack cocaine.

3        Further, the evidence affirmatively suggests that it would have been difficult or

4   impossible to compel Michael Walker to give up the laptop by kidnapping Martin.  In all

5   likelihood, Shakir, who was familiar with Michael Walker and Martin would have known as

6   much.  First, Michael Walker testified favorably for Shakir, stating that Martin appeared to be

7   under the influence of crack cocaine on the night in question and that he did not suffer his

8   claimed physical injuries.  It is evident from the record evidence that Michael Walker did not

9   believe Martin's claims.  Further, although Shannon Walker was able to locate Michael Walker

10  with little trouble, Martin was unable to do so despite alleged threats to his life.  This too shows

11  that it would have been difficult for Shakir to use Martin to procure the laptop from Michael

12  Walker.

13       More importantly, the Government submitted absolutely no evidence consistent with the

14  theory that Shakir intended to exact the laptop from Michael Walker by kidnapping Martin.

15  Although Michael Walker lived at the same residence as Martin and was, thus, likely to return,

16  Shakir did not tell anyone at the residence that he wanted to speak with Michael Walker.  He did

17  not tell anyone the reason for his taking Martin.  He did not offer to return Martin in exchange

18  for the laptop or threaten to harm Martin if the laptop was not returned.  Although the other

19  family members were able to contact Michael Walker in a short period, neither Shakir nor

20  Anderson asked any of them to do so.  The family members did not contact Michael Walker

21  when Shakir arrived at the home.  Further, no witness testified that Shakir said or did anything

22  that would imply that he would release Martin if and when Michael Walker handed over the

23  laptop.  Such conduct would be consistent with kidnapping Martin to exact the laptop from

24  Michael Walker.  The absence of any similar facts precludes a finding, beyond a reasonable

25  doubt, that Shakir intended to exact the laptop from Michael Walker.

26       Instead, the Government merely submitted evidence that Shakir forced Martin into a car

27  and attempted to compel Martin to locate Michael Walker.  No reasonable jury could conclude

28  beyond a reasonable doubt, based on this evidence, that Shakir intended to exact the laptop from

Michael Walker.  Rather, the evidence shows that Shakir intended to compel Martin to locate

Michael Walker or the laptop.  This does not amount to kidnapping to exact a thing of value.

### 3.   Conclusion

Because the government presented no evidence that Shakir intended to exact the laptop

from Michael Walker through kidnapping Martin, there was insufficient evidence to sustain a

conviction for aggravated kidnapping on the theory that Shakir intended to exact a thing of value

from Walker.

### B.   Intent to Commit Extortion

California Penal Code § 518 defines extortion as "the obtaining of property from another,

*with his consent* . . . induced by a wrongful use of force or fear, or under color of official right."

(emphasis added).  Under Section 209(a), in order to kidnap to commit extortion, an individual

must kidnap another with the intent to commit the offense of extortion – i.e. to obtain property

through consent by use of force or fear.  The offense does not require a victim other than the

kidnapped individual.  *People v. Superior Court (Deardorf)*, 183 Cal. App. 3d 509, 513-14

(1986).

The Government's theory that Shakir intended to extort something from Martin is

defective for the following reasons:  a) there is insufficient evidence in the record to prove,

beyond a reasonable doubt, that Shakir attempted to procure the laptop through extortion; and b)

information about the location of the laptop was not property subject to extortion.

### 1.   There Is Insufficient Evidence to Prove, Beyond a Reasonable Doubt, that Shakir Attempted to Obtain the Laptop through Extortion

It is clear that the crime of kidnapping for extortion requires the defendant to kidnap the

victim with the intent of obtaining property through the victim's consent or the consent of a third

party.  *Id.* at 514 (kidnapping and obtaining property through consent); *People v. Torres*, 33 Cal.

App. 4th 37, 50 (1995).  "[M]oney or property is obtained from a person with his consent if he

with apparent willingness gives it to the party obtaining it with the understanding that thus he is

to save himself from some personal calamity or injury . . .."  *People v. Peck*, 43 Cal. App. 638,

645 (1919). Thus, in *People v. Superior Court (Deardorf)*, 183 Cal. App. 3d at 514, proof that

1   defendants held victim at gunpoint, forced him to drive several miles, and then forced him to put
2   up his car as bond for a debt, was sufficient to sustain claim for kidnapping for extortion.

3        In contrast, Kidnapping for robbery under California Penal Code § 209(b) requires the
4   specific intent to rob. *People v. Jones*, 58 Cal. App. 4th 693, 717 (1997).

5        The dividing line between kidnapping for extortion and kidnapping for robbery is
6   consent: taking with consent is extortion; taking without consent is robbery. *See People v.*
7   *Kozlowski*, 96 Cal. App. 4th 853, 866 (2002) (citations omitted). Both extortion and robbery
8   share a similar structure and involve the element of "acquisition by means of force or fear." *Id.*
9   (citations omitted). The paradox of taking through force or fear, but with consent, has been
10  well-recognized. *Torres*, 33 Cal. App. 4th at 50 n.6. Oftentimes, "the acts sought to be punished
11  by the crime of extortion . . . result in the obtaining of things of value which would not be
12  subject to robbery from the person." *Kozlowski*, 96 Cal. App. 4th at 866 (citation omitted) (PIN
13  code for ATM card is property for purposes of extortion). Indeed, extortion can be used to
14  obtain property not presently in the victim's physical control whereas robbery cannot. *Torres*,
15  *supra*.

16       In this case, Shakir would have a perfect defense to the crime of kidnapping for robbery
17  under the doctrine of claim-of-right. This doctrine holds that a defendant's good-faith belief that
18  he owns the property in question negates the specific intent required to commit robbery. *People*
19  *v. Barnett*, 17 Cal. 4th 1044, 1142-1143 (1998). Therefore, one cannot kidnap with the intent to
20  rob under Section 209(b) if he has a good-faith belief that he owns the property at issue.
21  However, claim-of-right is not a defense to kidnapping for extortion. *See People v. Serrano*, 11
22  Cal. App. 4th 1672, 1677-78; *Lancaster*, 41 Cal. 4th at 88. Accordingly, Shakir was charged
23  with kidnapping for extortion but not kidnapping for robbery.

24       However, in the present case there is no evidence, from which a reasonable jury could
25  find, beyond a reasonable doubt, that Shakir intended to commit extortion – i.e. by obtaining
26  Martin's, or anyone else's, consent – rather than robbery – i.e. by taking the laptop without
27  consent. Instead, at best the evidence shows that Shakir intended to take the laptop from
28  whoever had it with or without their consent.

Based on the Government's evidence, Shakir and his brother beat Martin while Martin was on the ground in the fetal position. They then forced Martin up from the ground and into an automobile and continued to beat him. Once inside, Martin allegedly saw a handgun in the car, and Shakir demanded that Martin take them to the laptop. Shakir then threatened to kill Martin if he did not take them. Once Martin escaped from the vehicle, the Government's evidence is that Shakir and his brother attempted to physically force Martin back into the car.

Nothing in this evidence suggests that Shakir even considered obtaining Martin's consent for the laptop. Simply put, this is not a case where the defendant attempted to get the victim to give over his rights in something through threat of "calamitous" consequences. Notably, there is no evidence that Shakir directly demanded that Martin turn over the laptop. There was no express threat of harm if Martin did not produce the laptop. *See e.g. People v. Lancaster*, 41 Cal. 4th 50 (2007) (defendant demands victim turn over radio equipment or things would "get nasty" or "get rough" and later kidnaps victim and attempts to force him to disclose location of property at threat of deadly force). There was no implied threat to harm Martin if he did not produce the laptop. *See e.g. Kozlowski*, 96 Cal. App. 4th at 857-58 (defendants ask victims for PIN number while holding them at gun- and knife-point). Accordingly, there are no facts in the record from which a reasonable jury could infer that Shakir intended to obtain Martin's consent for the laptop.

Although the argument could be made that Shakir assumed that Martin would agree to give up the laptop because the laptop belonged to Shakir, this argument fails based on Martin's claim that Michael Walker had the laptop. If Shakir believed Martin's claim, he could not have obtained Martin's consent because Martin did not possess the laptop. On the other hand, if Shakir did not believe that Michael Walker had the laptop, then the evidence of his continued physical assaults on Martin demonstrate that Shakir did not seek Martin's consent for the laptop.

Instead, the reasonable inference to be drawn from the Government's evidence is that Shakir was attempting to coerce Martin to disclose the location of the laptop so that he could take the laptop from whoever had possession of it – whether it was Martin, Michael Walker or another individual – with or without that person's consent.

The facts presented plainly support a conviction of kidnapping for robbery.  Indeed, this case is virtually indistinguishable from *People v. Curry*, 158 Cal. App. 4th. 766, 774-776 (2007), where the California appellate court sustained a conviction of kidnapping for robbery.  In that case a group of defendants severely beat the victim and then forced her into their car.  One was holding a BB gun to scare the victim.  They demanded that she "find some way" to retrieve $700 from her home.  They then forced her to call her home and have a family member meet them with the $700, which she did.  The appellate court sustained a conviction of kidnapping for robbery.[3]

If the facts were also sufficient to sustain a conviction for kidnapping for extortion, it would create a logically impossible outcome.  It would mean that Shakir could be convicted of both kidnapping for extortion and kidnapping for robbery based on the same criminal conduct.  This is impossible as the two are mutually exclusive: kidnapping for extortion requires the specific intent to obtain the victim's consent; kidnapping for robbery requires the specific intent to take property without the victim's consent.  One cannot both intend to obtain consent and to take without consent.  Thus, it would be inappropriate for the same conduct to subject the defendant to liability for two offenses that cannot possibly occur based on the same conduct.

The only way to avoid this paradox is to conclude that the jury could reasonably discern two different intents from the same underlying evidence.  However this raises serious problems with the burden of proof.  Indeed, if the evidence is reasonably susceptible to both inferences, the Government could not have established its case by a preponderance of the evidence, much less a reasonable doubt.  *See* CALJIC 2.90 (Reasonable doubt "is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction of the truth of the charge.") *and* CALJIC 2.50.2 ("'Preponderance of the evidence' means evidence that has more convincing force than that opposed to it. If the evidence is so evenly balanced that you are unable to find

---

[3]In *Curry* there was an even stronger case for extortion than here, because the defendants there made an express demand for the property, and forced the plaintiff to arrange for family members to turn it over under threat of force.

1  that the evidence on either side of an issue preponderates, your finding on that issue must be

2  against the party who had the burden of proving it.")

3       Because the evidence presented could not even demonstrate that it was more likely than

4  not that Shakir intended to commit extortion when he kidnapped Martin, no reasonable jury

5  could conclude, beyond a reasonable doubt, that Shakir had this intent.

6                  **2.       The Location of the Laptop Was Not Property**

7       In *People v. Kozlowski*, 96 Cal. App. 4th at 866-870, the California appellate court

8  characterized the PIN number to an ATM card as intangible property subject to extortion.  The

9  court noted both that the PIN code was valuable by virtue of its secrecy.  *Id.*  The court further

10 analogized to *People v. Kwok*, 63 Cal. App. 4th 1236 (1996), where an individual was convicted

11 of burglary for stealing a lock and having a duplicate key made although he always intended to

12 return the lock.  In *Kwok*, just as in *Kozloski*, the lost property was the value of the right to

13 exclusive access.

14       Indeed, the California courts have recognized that defendants may extort intangible

15 property.  *See e.g. People v. Cadman*, 57 Cal. 562, 563-64 (1881) (right to pursue appeal);

16 *People v. Baker*, 88 Cal. App. 3d 115 (1978) (right to file protest with Alcoholic Beverage

17 Control Board); *see also People v. Parker*, 217 Cal. App. 2d 422 (receiving confidential

18 telephone directory supplements, copying them, and returning them, can constitute receiving

19 stolen property).

20       Nothing in these cases suggests that information alone, even valuable information,

21 constitutes intangible property subject to extortion.  Indeed, in *People v. Dolbeer*, 214 Cal. App.

22 2d 619, 622-23 (1963), the California appellate court distinguished the information contained on

23 printed lists from the lists themselves.  The court noted that the lists were papers and, therefore,

24 personal property.  *Id.* at 623.  By holding that the PIN code, as separate from the card or

25 account, constitutes property, the court in *Kozlowski* recognized that it was giving property an

26 expansive definition.  The Court sees no reason to expand this definition further.

27       Certain intangible property has value because of its secrecy or security.  This includes

28 trade secrets, confidential business information, etc.  It also includes the PIN numbers in

*Kozlowski* and the lock in *Kwok*. The location of personal property does not have value because of its secrecy. While refusing to disclose the location of personal property may decrease the risk that such property will be stolen, information about the location itself gains nothing by being secret. Indeed, the location of personal property is generally valueless whether it is disclosed or not.

Other intangible property has inherent value, entirely separate from the value of real or personal property. For instance, a right to pursue a legal action has inherent value unmoored to any physical thing. The location of property has no such value. Instead, its value derives completely from the property itself.

Still other intangible property has value because of the ability to exclude others from using it. For instance, intellectual property is valuable because it gives the holder a monopoly on producing and selling certain goods. The location of an item of physical property does not gain value when others are excluded from it or lose value when others learn about it. Information about the location of property, divorced from the property itself, is valueless regardless of who is excluded from having it.

Nothing in *Kolowski* or *Kwok* suggests that all information, or even all valuable information, constitutes property subject to theft or extortion. Instead, most information is simply information and not property. To extend the definition of property to encompass all information, or even all valuable information, would stretch it so far beyond the common understanding of "property" as to be untenable.

### 3.   Conclusion

Because no reasonably jury could conclude beyond a reasonable doubt that Shakir intended to extort the laptop from Martin and because information of the whereabouts of the laptop was not property subject to extortion, no reasonable jury could have convicted Shakir of kidnapping for extortion.

### IV.   DISPOSITION

At the outset, the Court notes its grave equitable concerns in this case. Shakir is serving a life sentence based almost exclusively on the uncorroborated testimony of a single-witness, a

1  known crack-addict that stole the property at issue from Shakir and exchanged it for five doses

2  of crack cocaine.  This purported victim did not officially report the incident to police until a

3  year later, upon being pressured to report it in order to help convict Shakir of his sister's murder,

4  a crime for which Shakir was never charged.  The victim's testimony is hotly contested by

5  Shakir, controverted by statements of the victim's own mother and another family member, and

6  internally inconsistent and incredible.  Even if the State's evidence is believed, it demonstrates

7  that the victim stole Shakir's computer, lied about its whereabouts, and led Shakir on a search

8  for an individual who never had the computer in the first instance.

9       Shakir has a perfect defense to the most fitting charge, kidnapping for robbery.

10  Accordingly, the State charged him under a more ambiguous provision that does not have such a

11  defense.  The Government then presented its case, attempting to prove Shakir's specific intent to

12  extort or exact, by offering an equally ambiguous legal theory:  that Shakir intended to extort or

13  exact the computer from whoever had it, whether that person was the victim or a third-party.

14       The evidence in this case, and the Government's overbroad legal theory, is woefully

15  inadequate to support a conviction for kidnapping for extortion or to exact property from

16  another.  It certainly does not warrant a sentence of the severity imposed here.  As the Supreme

17  Court noted in *Harris v. Nelson*, 394 U.S. 286, 291, 89 S. Ct. 1082 (1969):

18            The scope and flexibility of the writ - its capacity to reach all manner

19            of illegal detention-its ability to cut through barriers of form and

20            procedural mazes - have always been emphasized and jealously

21            guarded by courts and lawmakers. The very nature of the writ

22            demands that it be administered with the initiative and flexibility

23            essential to insure that miscarriages of justice within its reach are

24            surfaced and corrected.

25       The Court would be delinquent in this equitable role if it allowed the State to detain

26  Shakir, potentially for the balance of his natural life, based on such evidence and such theory.

27

28

1    **Accordingly, the Court hereby GRANTS the Petition and ORDERS the**

2    **Government to produce Shakir at a hearing on November 17, 2008 at 8:30 a.m., to**

3    **determine the best means of assuring his release or receiving a new trial.**

4    IT IS SO ORDERED.

5    DATED: October 28, 2008

6

7    _David O. Carter_

     _____

8    DAVID O. CARTER
     United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28